IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
| : | No. 1:16-cr-00082-YK |
| v. : | |
| : | (Judge Kane) |
| WILLIAM CHANDLER AUGUSTA, <u>et al.</u>, : | |
| Defendants : | |

**MEMORANDUM**

This matter is before the Court on Defendants Scott Lane and William Staples' motions to suppress. (Doc. Nos. 576, 591.) An evidentiary hearing was held on these motions on August 29, 2017. The Court has taken under advisement the memoranda filed in connection with the motions to suppress and the evidence and testimony offered at the August 29, 2017 hearing. Upon careful consideration of these submissions and the applicable law, for the reasons provided herein, the Court will deny Defendants' motions.

**I.      BACKGROUND**

     A.      P<small>ROCEDURAL</small> B<small>ACKGROUND</small>

On May 11, 2016, a federal grand jury returned an 18-count Superseding Indictment charging 15 Defendants, including Defendants Scott Lane, Bruce Edgecombe, Dylan Heatherly, and William Staples, with production and non-production child pornography offenses under 18 U.S.C. §§ 2251 and 2252. (Doc. No. 143.) Specifically, Counts 9 and 10 charge Defendants Edgecombe and Lane with both aiding and abetting the production of child pornography in violation of 18 U.S.C. §§ 2251(a), and 2 (Count 9), and conspiracy to produce child pornography in violation of 18 U.S.C. §§ 2252(a), (e), and 2 (Count 10). Counts 11, 12, and 13 charge all four Defendants with conspiracy to receive and distribute child pornography in violation of 18 U.S.C. §§ 2252 (a)(2) and (b)(1) (Count 11); aiding and abetting the receipt and distribution of child

pornography in violation of 18 U.S.C. §§ 2252 (a)(2), (b)(1), and 2 (Count 12); and conspiracy to advertise child pornography in violation of 18 U.S.C. § 2251(d) (Count 13). Counts 14, 16, and 17 charge Defendants Lane, Staples, and Heatherly with advertising child pornography in violation of 18 U.S.C. § 2251(d) (Counts 14, 16, and 17). (Id.) Defendants Lane, Heatherly, and Staples are scheduled to be tried together on January 16, 2018.

On July 21, 2017, Defendants Lane (Doc. Nos. 576, 577), Staples (Doc. Nos. 587, 596), and Edgecombe (Doc. No. 578, 579), filed the instant motions to suppress statements made in violation of the Fifth and Sixth Amendments. On August 4, 2017, the Government filed a consolidated response in opposition to Defendants various pretrial motions, including Defendants' motions to suppress. (Doc. No. 616.) On August 21, 2017, Defendant Edgecombe filed an unopposed motion to withdraw his motion to suppress and supporting brief (Doc. No. 582), which this Court granted in an Order dated August 24, 2017. (Doc. No. 640). On August 29, 2017, the Court held a hearing on the motions to suppress.

B.     F<small>ACTUAL</small> B<small>ACKGROUND</small>[1]

    **1. Defendant Staples**

The Government offered the testimony of Special Agent David Ramalho ("Special Agent Ramalho"), with Homeland Security Investigations ("HSI"), and Detective Thomas Bell ("Detective Bell"), with the Cybercrime Division of the Kentucky Office of the Attorney General, on Defendant Staples' motion to suppress evidence. Defendant Staples also testified at the suppression hearing on his own behalf.

Special Agent Ramalho testified that on April 20, 2016, at approximately 8:00 a.m., he, along with a uniformed Kentucky State Trooper, and four agents with the Cybercrime Division

---

[1] The Factual Background section of this Memorandum reflects the testimony offered at the evidentiary hearing held on August 29, 2017.

of the Kentucky Office of the Attorney General, including Detective Bell, executed a search warrant on Mr. Staples' home. (Tr. at 12.) According to Special Agent Ramalho, the agents approached Defendant Staples' home and secured the perimeter. Once the agents were positioned at the entrances of the home, Detective Bell knocked on the front door and announced his presence, at which point Defendant Staples opened the door for the agents. (Tr. 13: 17-21.) Detective Bell testified that the agents were outfitted in tactical gear for the execution of the search warrant, per standard protocol. (Tr. 34: 4-5.) Both Special Agent Ramalho and Detective Bell recalled that Staples was frisked but not handcuffed, and then escorted to the kitchen—located near the front door—while agents secured the residence. Approximately fifteen minutes later, Special Agent Ramalho sat down at the kitchen table with Detective Bell and Defendant Staples, introduced himself, and proceeded to read Defendant Staples his <u>Miranda</u> rights. (Tr. 15: 1-5.) Defendant Staples was then presented with a statement of rights and waiver form used by the Department of Homeland Security, which he signed and dated, indicating his agreement to waive his <u>Miranda</u> rights and speak with law enforcement officials without an attorney present. (<u>See</u> Gov't Ex. 3.) Both Special Agent Ramalho and Detective Bell witnessed Defendant Staples execute a written waiver of his <u>Miranda</u> rights. (<u>Id.</u>) Special Agent Ramalho testified that he did not notify Defendant Staples of the pending indictment against him, but did show him a copy of the search warrant and arrest warrant for John Doe-7. (Tr. 30: 4-25.) The interview was recorded. (<u>See</u> Government Exhibit 1.)

Special Agent Ramalho and Detective Bell recalled Defendant Staples being fairly well-educated, cooperative, and willing to answer questions. (Tr. 20-21.) Special Agent Ramalho noted at the suppression hearing that Defendant Staples was initially overwhelmed, but "was paying attention to what [agents] were saying. (Tr. 21: 1-7.) And, you know, . . . if he had a

3

question about something, he would ask." (Tr. 21: 1-3.) Special Agent Ramalho further testified that Defendant Staples elaborated on several of the questions asked of him, and was generally "coherent and attentive to what was going on." (Tr. 21: 5-6.) Both Special Agent Ramalho and Detective Bell testified that they did not perceive that Defendant Staples' medical condition interfered with his ability to participate in the interrogation. (Tr. 22: 20-25 ("I just thought he may, like, be suffering from a cold or something like that.").) Approximately fifteen minutes after the interview concluded at 9:29 a.m., Defendant Staples was arrested and transported to the Fayette County Detention Center in Lexington, Kentucky. (Tr. 41:1-7.)

### 2. Defendant Lane

The Government called HSI Agents James Krause ("Special Agent Krause"), Tara Mulkearns ("Special Agent Mulkearns"), and Steven Mullen ("Special Agent Mullen"), who testified to the events surrounding the execution of the search warrant on Defendant Lane's residence and the subsequent interrogation of Defendant Lane. Defendant Lane also testified at the suppression hearing on his own behalf.

Special Agent Krause testified that he was the affiant on the search warrant and participated in the search of Defendant Lane's apartment located at 401 West 56th Street, New York, New York on April 12, 2016. (Tr. 70-71.) Special Agent Krause testified that he, along with eight law enforcement agents, including Special Agent Mulkearns and Special Agent Mullen, arrived at Defendant Lane's two-bedroom apartment, located on the fourth floor of the high rise building, at approximately 6:00 a.m. (Tr. 71:12-24.) Agents knocked on the door multiple times before Defendant Lane's roommate, Cory Simonds ("Mr. Simonds"), answered. (Tr. 71: 12-24.) The agents entered the apartment, informed Mr. Simonds of the search warrant

4

for the premises,[2] and then began conducting a protective sweep of the apartment before effectuating the search warrant. (Id.) According to Special Agent Krause, Mr. Simonds informed agents at that time that his roommate, Defendant Lane, was still asleep in his bedroom. (Id.) Special Agent Krause and Special Agent Mulkearns proceeded to Defendant Lane's bedroom, located in the back of the apartment, opened the bedroom door, and woke him up. Special Agent Krause informed Defendant Lane that a search warrant was issued for his residence and offered to give him a moment to dress himself before reading Defendant Lane his Miranda rights from a standard statement of rights form. (Tr. 73: 17-25; 74: 1-3.) After advising Defendant Lane of his Miranda rights, Special Agent Krause allowed Defendant Lane an opportunity to read the statement of rights form himself, and then inquired into whether Defendant Lane wished to waive those rights by signing the statement of rights form. Special Agent Krause testified that Defendant Lane ultimately agreed in writing to waive his rights and speak with agents without an attorney. (Tr. 74-75.)

Upon signing the Miranda waiver, Defendant Lane inquired into the nature of the investigation, to which Special Agent Krause responded that agents were "investigating a crime that took place based on his IP address that was registered in his name." (Tr. 76: 1-4.) Special Agent Krause did not recall apprising Defendant Lane that he was a suspect in that investigation, however.[3] (Tr. 83: 8.) Special Agent Krause testified at the suppression hearing that Defendant

---

[2] Special Agent Mullens testified at the suppression hearing that he interviewed both Mr. Simonds and Defendant Lane. In the course of conducting those interviews, Special Agent Mullens arrived at the conclusion that Mr. Simonds did not likely commit the offenses linked to the screenname "NYC perv." (Tr. 103: 2-15.)

[3] Defendant Lane testified at the suppression hearing that agents initially communicated to him that they were "looking for a witness," and had requested that Defendant Lane "help identify somebody who committed a crime." (Tr. 117 at 17-21.) However, according to Defendant Lane, as the interview progressed, "red flags were going off in [his] . . . mind saying, okay, this isn't

5

Lane "spoke with [them] freely, he was completely, you know, awake and coherent. He wasn't, you know, surprised anymore." (Tr. 83:5-7.) As Special Agent Krause's explained at the suppression hearing, Defendant Lane didn't "necessarily refuse any of the questions[,] . . . [h]e wouldn't elaborate on some of his answers . . . . He was pretty cooperative in answering [their] questions." (Tr. 83:20-25.) Special Agent Mulkearns attested to observing during the course of that interview that Defendant Lane was "very calm, and he didn't seem surprised at all. Like, he wasn't nervous." (Tr. 94: 24-25; 95: 1.) Agents interviewed Defendant Lane in his bedroom for approximately twenty minutes, and then relocated to Mr. Simonds' bedroom to continue the interview, later completing the interview at approximately 7:50 a.m. in the living room. (Tr. 79: 2-9.) At no point during the interrogation was Defendant Lane handcuffed or otherwise subjected to physical restraints. (Tr. 79: 18-22.) Agents permitted Defendant Lane to use the restroom and provided Defendant Lane with something drink at his request. (Id.)

Special Agent Krause represented at the suppression hearing that the last statement Defendant Lane made during the interview was that he "was being selfish, he didn't want to speak any further about what he saw because he didn't know the law, and then said, I want an attorney." (Tr. 80: 9-16.) Upon hearing that response, Special Agent Krause testified that agents ceased questioning Defendant Lane, at which point Special Agent Krause then excused himself, walked into the hallway and placed a call to the Assistant United States Attorney. (Tr. 80: 13-16.) At approximately 8:00 a.m., Defendant Lane was served with an arrest warrant. (Tr. 88: 9-12.)

---

just about being a witness to a crime, it sounds like there's something more to that." (Tr. 117: 14-24; 119: 1-4.) Defendant Lane represented that he had indicated to the interviewing agents "on several occasions in the middle, later half of the questioning," that he "didn't feel comfortable answering these questions without, you know, someone present or representation." (Tr. 118: 25; 119: 1, 4-6.)

6

## II. DISCUSSION

### A. DEFENDANT STAPLES' MOTION TO SUPPRESS

Defendant Staples moves to suppress the incriminating statements made during his April 20, 2016 interrogation on the basis that the interrogation violated his Fifth Amendment right against compelled self-incrimination and his Sixth Amendment right to counsel. (Doc. No. 591.) Defendant Staples advances two arguments in support of his motion to suppress. (Doc. No. 593.) First, Defendant Staples contends that he did not make a voluntary, knowing, or intelligent waiver of his Miranda rights due to severe illness, police coercion, and the failure of law enforcement officials to promptly inform him of the pending indictment against him. (Id. at 7.) Second, Defendant Staples argues that the interviewing agents failed to advise him that he had been indicted prior to eliciting incriminating statements from him, constituting a violation of the Sixth Amendment. (Id. at 4.) The Court considers each argument in turn.

#### 1. The April 20, 2016 interrogation did not violate Defendant Staples' Fifth Amendment privilege against self-incrimination.

In his brief in support of his motion to suppress, Defendant Staples challenges the validity of his Miranda waiver. (Id. at 7.) Specifically, Defendant Staples argues that the "Miranda waiver was not knowing, intelligent, and voluntary under the totality of the circumstances because he was severely ill when he executed the Miranda waiver and the circumstances were such that it did not appear that . . . [he] could refuse to speak with law enforcement officers." (Id.) Moreover, Defendant Staples argues that his waiver was invalid due to law enforcement agents' failure to inform him that he was under an indictment prior to commencing the interrogation on April 20, 2016. (Id. at 9.)

7

The Fifth Amendment to the United States Constitution contains an individual privilege against self-incrimination, and <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), provides a mechanism to safeguard that privilege. 384 U.S. at 467 ("In order . . . to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored."). Before interrogation, the accused must be fully informed of the "State's intention to use his statements to secure a conviction," <u>Moran v. Burbine</u>, 475 U.S. 412, 420 (1986), and of his rights to remain silent and to have counsel present if he so desires. <u>Miranda</u>, 384 U.S. at 469. An accused may waive his or her rights verbally or in writing, so long as he or she makes "a deliberate choice to relinquish the protection those rights afford." <u>United States v. Whiteford</u>, 676 F.3d 348, 362 (3d Cir. 2012) (quoting <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 385 (2010)).

When the issue of waiver arises on a motion to suppress evidence, the prosecution bears the burden of showing a knowing and intelligent waiver of Fifth Amendment rights. <u>United States v. Crook</u>, 502 F.2d 1378, 1381 (3d Cir.1974). A court will first inquire whether "the relinquishment of the right [was] voluntary in the sense that it was the product of a free and deliberate choice," and whether the waiver was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Moran</u>, 475 U.S. at 421. "The ultimate question in the voluntariness calculus is 'whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution.'" <u>Fahy v. Horn</u>, 516 F.3d 169, 194 (3d Cir. 2008) (quoting Miller v. Fenton, 474 U.S. 104, 112 (1985)).

Generally, a validly-executed standard form may suffice to show a voluntary, intelligent, and knowing waiver of one's rights. <u>Alston v. Redman</u>, 34 F.3d 1237, 1253 (3d Cir.1994). As

8

the Third Circuit has explained, a waiver, verbal or written, is merely a freely revocable statement of intent to abandon one's rights—the true waiver occurs when the individual begins answering questions. Collins v. Brierly, 492 F.2d 735, 739-40 (3d Cir. 1974). Consequently, a waiver form serves an evidentiary purpose in that it establishes "with a minimum of difficulty and a maximum of certainty that the police gave the warnings and that the suspect had agreed— preliminarily—to answer questions." Id. at 739.

Here, the Court finds that Defendant Staples knowingly, intelligently, and voluntarily executed a valid Miranda waiver. The record reflects that Special Agent Ramalho provided Defendant Staples a copy of the search and arrest warrants and informed him of the following:

> You have the right to remain silent. Anything you say can be used against you in a court of law or other proceedings. You have the right to consult an attorney before making any statements or asking any questions. You have the right to have an attorney present with you during questioning. If you cannot afford an attorney, one will be appointed for you before any questions if you wish. If you decide to answer questions, . . . you still have the right to stop questioning at any time, we'll stop the questions to consult your attorney. Do you understand these rights as a I have read them to you?

(Gov't Ex. 2 at 2.) Defendant Staples not only responded in the affirmative to the question of whether he understood his rights as they were read to him, but also confirmed with Special Agent Ramahlo his right to remain silent and consult with an attorney at any time during the questioning, should he so choose. (Id.) As the interrogation transcript and copy of the signed waiver documents, Defendant Staples executed the standard form waiving his constitutional rights in the presence of two witnesses following a thorough admonition of his Miranda rights. (Gov't Ex. 2; Gov't Ex. 3.) He then proceeded to answer agents' questions for approximately one hour. (See Gov't Ex. 2.)

The Court is unpersuaded by Defendant Staples' argument that he could not give a fully informed waiver of his Fifth Amendment privilege against self-incrimination due to his later

9

diagnosed pneumonia and influenza. There is nothing from the record—particularly the transcript of the recorded interrogation—that would suggest that Defendant Staples' illness impeded him from understanding the nature of the rights he was abandoning or the consequences of the decision to waive his Miranda rights. Rather, the transcript of the interrogation supports that Defendant Staples' condition was stable and his faculties were fully intact, as he provided coherent, lucid responses to the questions posed by law enforcement officials throughout the hour-long interrogation. Indeed, as noted by the Government in its omnibus brief in opposition to Defendant Staples' motion to suppress, the "level of detailed recollection about the precise activity for which law enforcement was there to investigate demonstrates that [Defendant] Staples was not too ill to knowingly, intelligently, and voluntarily waive his Miranda rights." (Doc. No. 616 at 77.) The Court's finding that Defendant Staples' illness did not interfere with his ability to effectively communicate with law enforcement officials or appreciate the significance of waiving his Miranda rights is further buttressed by Special Agent Ramahlo's observations borne out by his testimony at the suppression hearing that Defendant Staples was "willing[ ] to answer questions[,] . . . able[ ] to ask questions[,] . . . was compliant," and was "paying attention to what we were saying. . . . [I]f he had a question about something, he would ask or he would . . . elaborate . . . on any of the questions that we were asking him. . . . So I knew he was listening . . . and attentive to what was going on." (Tr. 20-21.)

Moreover, Defendant Staples did not communicate to law enforcement officials the seriousness of his illness, or request immediate medical attention at the time he signed the waiver or at any point thereafter. Rather, as Detective Bell confirmed at the suppression hearing, Defendant Staples merely mentioned in passing towards the end of the interview, in response to his question regarding whether Defendant Staples was taking any prescription medication, that:

10

> MR. STAPLES: Yeah, well [I] was as of the day before yesterday [on an] antibiotic and a cough syrup. And I actually put it in the car today to take with me because I thought they might [sic] end up admitting me.
>
> UNIDENTIFIED PERSON: Why would they admit you?
>
> MR. STAPLES: Because I'm so dehydrated and after they do this, well, after they were going to do this chest x-ray, the, the nurse diagnosed me the day before yesterday with bronchitis, but I've hardly been able to, it's hard to do anything for 10 minutes without feeling like I'm going to pass out.
>
> UNIDENTIFIED PERSON: All right.

(Gov't Ex. 2 at 60.) The record supports that Defendant Staples gave no indication that he required immediate medical attention before he could conceivably be in a position to waive his Miranda rights. Indeed, Special Agent Ramahlo recalled having no reservations about continuing the interview with Defendant Staples, as he believed Defendant Staples to be suffering from "a cold or something like that" from his observations of Defendant Staples occasionally coughing during the course of the interrogation. (Tr. 22: 20-25.) Further, Detective Bell recounted at the suppression hearing that Defendant Staples "coughed a few times," and was "moving a little slow, but, . . . it wasn't [with] any difficulty. He wasn't leaning on anything or gasping for air or trying to steady himself." (Tr. 36-37.) Accordingly, the Court rejects Defendant Staples' position that his medical condition somehow precluded him from fully appreciating the import of the Miranda warnings and the significance of his subsequent waiver of his Miranda rights as would render his Miranda waiver invalid.

The Court also finds unavailing Defendant Staples' argument that he was subjected to coercive pressures from law enforcement agents, which induced him to involuntarily waive his Miranda rights. Defendant Staples insists that he believed he could not refuse to speak with law enforcement officers because they were "armed and rummaging through [his] home." (Doc. No. 593 at 9.) However, the record is devoid of any evidence from which the Court could conclude

that Defendant Staples was verbally or physically threatened, deceived, or otherwise coerced into waiving his Miranda rights by the interviewing agents. The testimony and evidence offered at the suppression hearing reveal that Defendant Staples was interrogated at his kitchen table with two officers present at any given time. (Tr. 25.) He was permitted to remain comfortably seated during the entirety of the interview, and was not placed in restraints. (Tr. 24: 8-15.) While agents were outfitted in standard tactical gear and had initially drawn their weapons upon entry into Defendant Staples' residence, the Court finds credible Special Agent Ramahlo and Detective Bell's testimony that their guns were holstered during the course of the interview. (Id.) As the recording of the interrogation demonstrates, Defendant Staples was advised of his rights and questioned in a "civil, cordial," and conversational tone. (Id.) At his request, Defendant Staples was provided his glasses and something to drink at the outset of the interview. (Tr. 36: 24-25; 37: 1-2.) Under the totality of the circumstances, Defendant Staples voluntarily, knowingly, and intelligently waived his Miranda rights and thus, is not entitled to suppression of the statements made during the April 20, 2016 interrogation.

Finally, Defendant Staples' argument that he could not fully appreciate and thus voluntarily waive the rights of which he was advised due to interviewing agents' failure to advise him at the outset of the interrogation of the pending indictment is likewise untenable. Notably, Defendant Staples cites no authority to support his position that the law requires an interviewing agent to advise a defendant of the existence of the indictment in order to adequately apprise a defendant of his Miranda rights and obtain a valid waiver. To that end, the Court is hard pressed to discern how advising Defendant Staples of the existence of an indictment against John Doe-7 would be material to, or have any bearing on, a finding that Defendant Staples voluntarily

executed a valid <u>Miranda</u> waiver.[4]  In essence, Defendant Staples has failed to proffer sufficient evidence to refute the Government's showing that the waiver of his Fifth Amendment rights "was the product of a free and deliberate choice rather than intimidate, coercion, or deception," and was made with a "full awareness of both the nature of the right being abandoned and the consequence of the decision to abandon it."  <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).  Accordingly, the Court will deny Defendant Staples' motion to suppress as it relates to his Fifth Amendment claim.

### 2.  The April 20, 2016 interrogation did not violate Defendant Staples' Sixth Amendment right to counsel.

Defendant Staples, principally relying on <u>Carvey v. Le Fevre</u>, 611 F.2d 19 (2d Cir. 1979), claims that law enforcement officers' delay in informing him of the pending indictment until the interrogation was well underway precluded a knowing waiver of his Sixth Amendment right to counsel, which he claims initially attached on March 30, 2016, when a federal grand jury indicted "John Doe-7."  (Doc. No. 593 at 4.)  Defendant Staples maintains that law enforcement agents deliberately misled him into believing that "they were at his house solely to perform the search, while they were in fact also there to arrest him on the indictment." (<u>Id.</u> at 6.)  In opposition to Defendant Staples' motion to suppress, the Government reasons that Defendant Staples' right to counsel did not attach at the time that "John Doe-7" was indicted, but rather, attached when he was formally arrested following the interrogation and execution of the search

---

[4] As this Court describes in further detail herein, providing an "indicted defendant <u>Miranda</u> warnings is sufficient to make 'knowing and intelligent' his waiver of the [S]ixth [A]mendment right to counsel, even if the defendant has not been expressly informed of the indictment pending against him."  <u>United States v. Charria</u>, 919 F.2d 842, 848 (2d Cir. 1990).  It would logically follow then, that advising an indicted defendant of his <u>Miranda</u> rights would also be sufficient to make "knowing and intelligent" his waiver of the Fifth Amendment privilege against self-incrimination, even if that defendant has not been expressly informed of the pending indictment against him.

13

warrant on his residence, at the point when law enforcement agents had probable cause to believe that Defendant Staples was "John Doe-7." (Doc. No. 616 at 71-72.) Moreover, the Government argues that Defendant Staples nevertheless validly waived his post-indictment Sixth Amendment right to counsel despite not being advised of the pending indictment until after he signed the <u>Miranda</u> waiver. (<u>Id.</u> at 72-73.)

Even accepting Defendant Staples' position that the indictment triggered the attachment of his right to counsel under the Sixth Amendment, the Court nevertheless finds that the April 20, 2016 post-indictment interrogation did not violate Defendant Staples' Sixth Amendment right to counsel. As the Government correctly argues, Defendant Staples' reliance on <u>Carvey v. Le Fevre</u>, 611 F.2d 19 (2d Cir. 1979), for the proposition that law enforcement agents are constitutionally required to expressly apprise a defendant of the indictment before a post-indictment Sixth Amendment waiver will be considered valid, is misplaced. (<u>Id.</u> at 73.) <u>Carvey</u> was abrogated by the United States Court of Appeals for the Second Circuit's decision in <u>United States v. Charria</u>, 919 F.2d 842, 848 (2d Cir. 1990), which held that "giving an indicted defendant <u>Miranda</u> warnings is sufficient to make 'knowing and intelligent' his waiver of the [S]ixth [A]mendment right to counsel, even if the defendant has not been expressly informed of the indictment pending against him." <u>United States v. Charria</u>, 919 F.2d 842, 848 (2d Cir. 1990); see <u>Patterson v. Illinois</u>, 487 U.S. 285, 293 (1988) ("As a general matter, then, an accused who is admonished with the warnings prescribed by this Court in <u>Miranda</u>, . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one."). Thus, "even absent being informed that he was under indictment, the <u>Miranda</u> warnings gave [Defendant Staples] ample notice of the dangers of self-representation at a critical stage in the

14

proceedings against him." Charria, 919 F.2d at 848; Norman v. Ducharme, 871 F.2d 1483, 1486–87 (9th Cir. 1989) (holding that accused's waiver knowingly obtained after police showed the accused a copy of his arrest warrant, read him the Miranda warnings, and the accused signed a Miranda waiver form); Riddick v. Edmiston, 894 F.2d 586, 591 (3rd Cir. 1990) (holding accused's waiver valid where accused was advised of his Miranda rights and had signed a waiver of extradition that noted the charge against him even though authorities did not specifically inform him of his indictment).[5] Accordingly, the Court will deny Defendant Staples' motion to suppress as it relates to his Sixth Amendment claim.

B. DEFENDANT LANE'S MOTION TO SUPPRESS

In his motion to suppress, Defendant Lane challenges his April 12, 2016 interrogation as violative of the Fifth and Sixth Amendments. (Doc. No. 577 at 7.) He appears to imply in his motion that he was subject to a custodial interrogation, but not administered Miranda warnings, thereby depriving him of his right to be free from compulsory self-incrimination under the Fifth Amendment. (Id. at 8.) Defendant Lane also advances an identical argument to that of Defendant Staples—that the failure to inform him of the pending indictment against him at the outset of the interrogation violated his Sixth Amendment right to counsel. (Id. at 11.)

As it concerns Defendant Lane's argument that his statements were obtained in violation of Fifth Amendment rights, conspicuously absent from Defendant Lane's motion to suppress is any mention of the written Miranda waiver containing his initials and signature. The record supports that the interviewing agent complied with Miranda procedures in obtaining Defendant Lane's written waiver of his Fifth Amendment rights prior to eliciting any purportedly

---

[5] Notably, Defendant Staples did not retract his waiver or refuse to answer any further questions upon receiving notice from Special Agent Ramahlo and Detective Bell thirty minutes into the interrogation of the pending indictment.

15

incriminating statements from Defendant Lane. The Court credits the testimony of Special Agent Mulkearns that, ten minutes after gaining entry to Defendant Lane's apartment, and before commencing the interrogation, he presented Defendant Lane with a statement of rights, read the standard form aloud to Defendant Lane, directed Defendant Lane to read the statement of rights himself, and instructed Defendant Lane to initial each line to confirm that he had, in fact, read the entire statement of rights form. United States v. Andrews, 231 F. App'x 174, 176–77 (3d Cir. 2007) (finding defendant's statements voluntary when police advised defendant of his Miranda rights, gave defendant a written copy of the Miranda warnings, and prompted defendant to read portions of the warnings aloud and write his initials after each warning). A copy of the standard statement of rights form distributed by the Department of Homeland Security, identified in the record as Government Exhibit 4, provides as follows:

> Before we ask you any questions, it is my duty to advise you of your rights:
>
> You have the right to remain silent.
>
> Anything you say can be used against you in a court of law or other proceedings.
>
> You have the right to consult an attorney before making any statements or answering any questions.
>
> You have the right to have an attorney present with you during questioning.
>
> If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish.
>
> If you decide to answer questions now, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting any attorney.

(Gov't Ex. 4.)

On the lower half of the statement of rights, under the heading "Waiver," Defendant Lane signed and printed his name as an acknowledgement of the following: "I

16

have read, or someone has read to me, this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." (Id.) Defendant Lane signed the waiver in the presence of Special Agent Mulkearns, who also signed and dated the form. (Id.) In the absence of evidence that Defendant Lane's waiver of his rights was the product of coercion, intimidation, or deception, or was otherwise involuntarily obtained, the Court is compelled to conclude that in light of the totality of the circumstances, Defendant Lane made a knowing and intelligent waiver of his Miranda rights, and thus, was not deprived of protections afforded to him under the Fifth Amendment.[6]

As it relates to Defendant Lane's argument that his right to counsel under the Sixth Amendment was violated due to law enforcement agents' failure to notify him of the pending indictment against him, the Court finds, as it did in the context of Defendant Staples' motion to suppress, that even if Defendant Lane's Sixth Amendment right to counsel attached at the time that "John Doe-2" was indicted, the validly-executed waiver of his Miranda rights constituted a knowing and intelligent waiver of his Sixth Amendment right to counsel. United States v. Charria, 919 F.2d 842, 848 (2d Cir. 1990). Accordingly, the Court will deny Defendant Lane's motion to suppress.

## III.    CONCLUSION

---

[6] While not argued in his motion to suppress, Defendant Lane testified at the suppression hearing that he had communicated to the interviewing agents that he felt uncomfortable continuing to answer certain questions regarding the details of the six-year-old victim "without someone present." Insofar as Defendant Lane argues now that his expression of discomfort operated as an invocation of his right to consult with an attorney before answering any further questions, the Court finds that such statements did not operate as a clear and unambiguous invocation of his rights in that context. Indeed, a careful review of the transcript from the suppression hearing reveals that Defendant Lane conceded on cross-examination that he never explicitly referenced or requested consulting with an attorney before answering any additional questions.

Based upon the foregoing, the Court will deny Defendants Scott Lane and William Staples' motions to suppress. (Doc. Nos. 576, 591.) An appropriate Order follows.